ELLINGSON TIMBER CO., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Ellingson Timber Co. v. Commissioner
Docket Nos. 4783,75, 4785-75, 4998-75, 5019-75, 5186-75.
United States Tax Court
T.C. Memo 1977-197; 1977 Tax Ct. Memo LEXIS 244; 36 T.C.M. (CCH) 809; T.C.M. (RIA) 770197; June 27, 1977, Filed Isidore Feldman, for the petitioners. Gary R. DeFrang, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Petitioner
Taxable Year
Deficiency
Ellingson Timber Co.
July 31, 1969
$ 7,973.20
(Docket No. 4783-75)
R. P. Ellingson and
1968
3,368.39
M. T. N. Ellingson
1969
58,857.00
(Docket No. 4785-75)
1970
1,535.00
Robert P. Ellingson, Jr. and
1968
5,463.76
Helen M. Ellingson
1969
49,995.00
(Docket No. 4998-75)
1970
2,324.00
Sigmund H. Ellingson and
1968
2,162.40
Lois Ellingson
1969
37,349.00
(Docket No. 5019-75)
1970
2,445.00
Donald M. Ellingson and
1968
2,686.91
Thaoma L. Ellingson
1969
36,588.00
(Docket No. 5186-75)
1970
999.00
*245 Respondent has claimed an increased deficiency of $625.48 in docket No. 4783-75. Other issues having been settled, the only issue remaining for decision is, for the purposes of section 631(a) [2], the fair market value, as of August 1, 1968, of timber cut by petitioner Ellingson Timber Co. and Ellingson Lumber Co. during their taxable year ended July 31, 1969. FINDINGS OF FACT Petitioner Ellingson Timber Co. (hereinafter Timber) is an Oregon corporation whose principal place of business is located in Baker, Oregon. For the year in issue, Timber utilized the accrual method of accounting and filed its Federal income tax return for the fiscal year ended July 31. Ellingson Lumber (hereinafter Lumber) is an Oregon corporation also maintaining its principal place of business in Baker, Oregon. During the year in issue, Lumber, an electing small business corporation, maintained its books and records on the accrual method of accounting and filed its Federal income tax return for the fiscal year ended July 31. At all relevant times, *246 Lumber's issued and outstanding stock was owned as follows: Shareholder
Number of Shares
R. P. Ellingson
2,500
Robert P. Ellingson, Jr.
2,500
Donald M. Ellingson
2,000
Sigmund H. Ellingson
2,000
The individual petitioners and their legal residences are as follows: Petitioners
Legal Residence
R. P. Ellingson and M. T. N. Ellingson,
Sun City, Arizona
husband and wife
Robert P. Ellingson, Jr. and Helen M.
Klamath Falls, Oregon
Ellingson, husband and wife
Sigmund H. Ellingson and Lois Ellingson,
Baker, Oregon
husband and wife
Donald M. Ellingson and Thaoma L.
Baker, Oregon
Ellingson, husband and wife Each of the individual petitioners used the cash receipts and disbursements method of accounting and filed joint Federal income tax returns on the basis of calendar years. Timber and Lumber were both engaged in the business of logging timber and manufacturing lumber, plywood, and related products. During the year in issue, Lumber maintained three principal sawmill facilities located at Unity, Baker, and Half-Way, all in Oregon. Each facility was involved in the manufacture of lumber. Timber maintained a plant at Baker, Oregon, *247 used primarily to produce plywood products. During the relevant period, the officers of both Timber and Lumber were as follows: President
R. P. Ellingson
Vice President
Robert P. Ellingson, Jr.
Vice President
Donald M. Ellingson
Vice President
Sigmund H. Ellingson
Prior to and during the years in issue, Timber and Lumber (hereinafter referred to jointly as the Ellingson companies) elected to treat the cutting of timber as a sale or exchange pursuant to section 631(a). The following schedules show the timber cut by each company during the taxable year ended July 31, 1969: ELLINGSON TIMBER CO.
Volume - MBF [1]
Date
Ponderosa
D. Fir
Engleman
All Other Tract
Acquired
Pine
Larch
Spruce
Species
Carson Creek
8/3/67
2,684.64
5,125.42
107.84
1,628.07
Cold Springs
11/15/66
560.34
3,450.44
1,213.42
479.29
Summit Creek
6/28/66
131.43
92.57
--
9.42
Long Sale
5/20/65
67.64
445.11
0.98
42.60
Lacey Camp LPP
11/24/67
77.73
116.68
3.90
480.55
Totals:
3,521.78
9,230.22
1,326.14
2,639.93
Percent of Total Cut:
21%
55%
8%
16%
ELLINGSON LUMBER CO.
Mud Springs
5/31/66
3.58
0.99
1.99
Canteen Camp
12/29/66
5,794.20
938.06
708.80
Pine Creek
12/28/66
128.74
3.34
2.14
Sheep Gap
12/28/67
3,399.19
362.34
283.27
Squanderson
Bug
1/29/68
693.20
19.28
69.29
Dry Creek Salv.
6/16/67
595.97
47.61
21.22
McCully Fork
6/1/67
1,706.10
2,352.49
1,390.53
West Fork Burnt
Creek
6/27/67
4,115.80
596.25
25.32
Huckleberry
10/24/67
2,606.97
2,541.61
578.74
Totals:
19,043.75
6,861.97
3,081.30
Percent of Total Cut:
66%
24%
10%
*248 Each tract of timber cut by the Ellingson companies during the years in issue was acquired under contracts with the United States Forest Service (USFS). Prior to entering these contracts, the USFS surveyed its lands for the purpose of gathering information concerning the volume and quality of the timber, and, based on such information, determined which tracts were to be offered for sale. The tracts offered for sale were advertised for 30 days in newspapers and advertisements sent to potential buyers. Those notices stated the offering price at which the USFS would sell the timber. Interested parties could submit bids prior to the advertised sale date for each species of timber at a price at least equal to the advertised USFS rates. All such bids were designated as qualifying bids. If only one qualifying bid was submitted, the party submitting it became the purchaser of the timber. If more than one qualifying bid was submitted, the ultimate purchaser was determined by an oral auction at which *249 all qualifying bidders could bid. Once the purchaser of the timber was determined, the purchaser and the USFS entered into a contract prescribing the conditions on which the timber cutting operations were to be carried out. The contracts set forth, among other provisions, a period (varying from 14 months to 46 months in the instant case) within which cutting was to be completed; the purchase price of each species of timber, subject to increase or decrease on a quarterly basis to reflect 50 percent of the difference between a described lumber product selling value base index and the current index computed in accordance with the contract; ecological requirements; provisions for assignment of the contracts subject to USFS approval; and requirements as to the construction and maintenance of specified roads and other facilities. The USFS determines its offering prices for timber by analyzing several factors, including (1) selling price of manufactured lumber products from timber having similar characteristics to that being offered, (2) costs of producing the lumber products from the timber, and (3) anticipated profit and risk margin. Using these factors, the selling price of timber *250 is calculated as follows: Selling price of lumber products Less: Cost of producing lumber products
Less: Margin for profit and risk
Equals: Advertised selling price of timber A representative sample of purchasers of USFS timber in eastern Oregon and Washington are requested by the USFS to provide information pertaining to lumber product selling prices and costs of producing such products. Using such information, the USFS determines the average selling price and production costs of lumber products derived from each species and grade of timber which it offers for sale. After adjustment to reflect the characteristics of the timber to be offered for sale and current market conditions, the USFS uses the average selling price and the estimated cost data to determine the price it will ask for timber sold in eastern Oregon where the facilities of Timber and Lumber are located. The factors in the pricing formulas are not the same for each tract of timber which the USFS offers for sale on a given date or during a given time period. Each tract has individual characteristics which affect such factors. The costs of production used in the 1968 USFS valuation formula reflected *251 cost data collected in 1966. The selling prices of lumber factor in this formula is updated to within three months of the advertising date by use of an industry index. During 1968, 21 tracts of timber were offered for sale and sold by the USFS in the Baker, Oregon, operating area. The following is a summary of these sales involving ponderosa Pine, White Fir, Western Larch, Douglas Fir and other species. The sales prices represented were reduced by specified road costs not chargeable to the purchaser: SALES PRICE PER SPECIES PER MBF AND VOLUME (Species volume per MBF is shown in parenthesis following sale price) Sale
Ponderosa
White
Western
Douglas Fir Tract
Date
Pine
Fir
Larch
& Others
Crockett Knob
2/19/68
$ 20.05
$ 10.11
$ 11.00
$ 10.25
(900)
(200)
(800)
(1,100)
Crevice Creek
3/11/68
25.40
11.90
12.20
(8,200)
(200)
(4,600)
Deadhorse
5/6/68
14.82
2.84
9.83
2.00
(320)
(340)
(360)
(180)
Buck Creek
5/7/68
17.86
11.71
14.34
(3,300)
(800)
(13,200)
Dry Fork
5/13/68
3.00
1.00
3.91
2.00
(4,400)
(1,000)
(500)
(2,200)
Dean Creek
5/20/68
3.82
3.77
11.02
(4,000)
(400)
(2,800)
Pinus Creek
6/3/68
14.29
13.44
14.38
(9,700)
(600)
(5,200)
McGraw
6/11/68
12.88
12.88
(1,900)
(6,600)
South Trail
Creek
6/12/68
Sage
6/17/68
15.67
10.42
10.72
(5,900)
(1,300)
(4,100)
Beecher Creek
6/18/68
$ 14.85
$ 11.20
$ 9.30
(7,800)
(1,500)
(3,800)
Umapine
6/24/68
28.89
28.99
28.89
(4,000)
(3,500)
(13,200)
Lockhart
6/28/68
3.00
5.34
7.73
(2,700)
(100)
(1,200)
Half Pine
7/22/68
17.62
19.01
14.35
(500)
(300)
(200)
Steep Creek
No. 1
8/5/68
27.81
17.33
22.31
(1,700)
(400)
(2,700)
Long Pond
8/6/68
40.05
40.00
40.00
(370)
(90)
(650)
Modesty
8/12/68
25.00
18.71
$ 22.80
15.05
Spring
(600)
(900)
Cracker
Creek
8/20/68
22.81
17.44
21.99
(2,60 0)
(100)
(1,700)
Mahogany
10/21/68
25.85
22.60
22.55
(2,700)
(800)
(5,800)
Granite
Creek
11/20/68
25.78
(9,500)
Squaw Creek
North
12/23/68
22.90
25.21
31.59
22.99
(6,500)
(1,100)
(1,000)
(3,900)
*252 These sales also included scattered tracts of Engleman Spruce, Larch, Ponderosa, Douglas Fir, White Fir and other species, at prices ranging from $7.11 per MBF to $19.00 per MBF. In November 1968, Crown-Zellerback Corporation (Crown) made a sale of logs to Kinzua Corporation (Kinzua). These logs consisted of timber cut from both virgin forest and previously cut timberland. The sales contract called for the logs to be delivered by Crown to Kinzua at the rollway. Thus, Crown was paid not only for stumpage value but also for costs of cutting the logs and transporting them to the delivery destination. The contract provided the following prices for the delivered logs: Virgin Ponderosa Pine
$ 47.00
White Pine
56.00
Residual Pine
40.00
Douglas Fir, Western Larch,
Engleman Spruce, Lodge
Pole Pine
41.50
White Fir
41.50
In November and December 1968, Crown sold to Kinzua 233 MBF and 142 MBF, respectively, of Ponderosa Pine logs under the terms of the contract. During September and October 1968, petitioner began negotiations with Edward Hines Lumber Co. (Hines) for the purchase of timber. These negotiations resulted in a contract between Timber and Hines *253 dated February 3, 1969, for the purchase of approximately 3,000,000 BF of Ponderosa Pine at $86.91 per MBF, plus 50 percent of the fluctuation in the quarterly Western Wood Products Association Lumber Price Trends Index for Inland Mills (WWPA Index), from the last quarter of 1968 until the quarter in which the logs were delivered. Indices based upon lumber and lumber product selling prices are periodically published, reflecting selling prices of many different timber products on a composite basis. One such index is the wwpa index, which is based upon lumber amd lumber product selling prices in Oregon and six other Western States. The WWPA Index is based upon per-species selling prices and is compiled on a monthly basis. The following is an example of the WWPA Index showing the monthly and quarterly price indices for Ponderosa Pine and Idaho White Pine lumber products: PONDEROSA PINE
IDAHO WHITE PINE
(1954-55-56 Basis)
(1951-52-53 Basis)
1968
1969
1970
1971
1968
1969
1970
1971
Jan.
89.03
129.81
111.37
106.46
101.33
131.77
131.27
11 8.78
Feb.
90.74
138.89
108.89
110.12
102.77
142.66
126.75
123.76
Mar.
92.78
148.51
108.34
119.05
105.07
155.49
129.07
132.02
* Avg.
(90.85)
(139.07)
(109.53)
(111.88)
(103.06)
(143.31)
(129.03)
(124.85)
Apr.
97.36 158.51
109.52
124.29
109.17
168.79
136.61
130.97
May
100.55
150.66
111.41
126.19
113.05
162.92
139.56
126.17
Jun.
100.11
136.71
111.61
127.45
112.25
138.77
140.11
124.85
* Avg.
(99.34)
(148.63)
110.85)
(125.98)
(111.49)
(156.83)
(138.76)
(127.33)
Jul.
101.10
124.18
1 09.53
131.86
112.33
124.83
133.33
131.08
Aug.
103.26
119.14
108.43
136.60
113.56
121.43
134.64
138.41
Sep.
105.25
113.39
108.34
138.77
114.11
119.82
131.74
140.63
* Avg.
(103.20)
(118.90)
(108.77)
(135.74)
(113.33)
(122.03)
(133.24)
(136.71)
Oct.
109.33
108.61
106.58 137.14
115.66
121.88
127.37
136.28
Nov.
113.73
106.72
106.28
136.45
119.03
127.16
119.15
134.55
Dec.
119.79
109.61
105.81
137.65
123.43
130.81
118.18
136.51
* Avg.
(114.28)
(108.31)
(106.22)
(137.08)
(119.37)
(126.62)
(121.57)
(135.78)
101.82
128.85
108.81
128.27
112.02
136.86
130.41
131.30
*254 The prevaoling trend of lumber product prices during 1968 and 1969 was upward. For the 1967 calendar year, the average price of lumber products was $87.04 per MBF, and for the 1969 calendar year the average selling price for lumber products was $128.85 per MBF, an increase of approximately 48 percent. The following table shows the contentions of the parties as to the fair market values as of August 1, 1968, of the timber cut by the Ellingson companies during the taxable year ended July 31, 1969: Ellingson Timber Co.
Fair Market Value per MBF Species
Petitioner
Respondent
Ponderosa Pine
$ 57.89
$ 34.00
Douglas Fir
45.54
30.00
Larch
45.83
30.00
White Fir
35.31
30.00
Spruce
39.53
30.00
Lodgepole
22.17
30.00
Ellingson Lumber Co.
Species
Ponderosa
$ 57.89
$ 34.00
Douglas Fir
45.14
32.00
Larch
45.83
32.00
White Fir
35.31
28.00
Spruce
39.53
28.00
Lodgepole
22.17
28.00
Waste OD
30.00
1.00
OPINION Section 631(a) [3] provides an elcetion which allows a taxpayer to treat the cutting of timber during a taxable year as a sale or exchange of a capital asset. If the electing taxpayer *255 has owned the timber or held cutting rights to it for six months, gain or loss from the sale or exchange is recognized in an amount equal to the difference between (1) the fair market value of the timber as of the first day of the taxable year in which the timber is cut, and (2) the taxpayer's adjusted basis for depletion of such timber. Section 1.631-1(d)(1), Income Tax Regs. Since both Timber and Lumber utilize a fiscal year ending July 31, the relevant date for valuing the timber cut during the fiscal year ended July 31, 1969, here in issue, is August 1, 1968. *256 Fair market value for purposes of section 631(a) is defined in the well-known formula, i.e., the price at which the timber would be sold in a transaction between a reasonably well-informed buyer and seller, neither being under any compulsion to buy or sell. Section 1.631-1(d)(2), Income Tax Regs. See Pope & Talbot, Inc. v. Commissioner,60 T.C. 74, 77 (1973), affd. per curiam 515 F.2d 155 (9th Cir. 1975). In arriving at the selling price, consideration must be given to all factors that would affect the selling price of the timber in the market place. These factors include the character, quality, quantity, and location of the timber; accessibility of such timber to sawmills; actual sales prices in transactions involving similar timber; and disinterested appraisals made through the use of approved methods. Section 1.611-3(f), Income Tax Regs.
In support of their respective positions as to the August 1, 1968, fair market value of the timber in question, the parties have presented the opinion of three experts, Gail Thomas and Sherman Feiss for petitioners, and William Burgess for respondent. The methods employed by these experts in reaching their respective *257 conclusions are based on one or more of the following: Comparable timber sales by USFS; other log sale transactions; conversion or "net back to the stump" computations; market advantages of the Ellingson companies; and general product value indices. The experts strongly differ as to what specific sales should be given weight, particularly the reliability of the USFS sales as a guide to fair market values.
Petitioner's first expert, Gail Thomas, used several approaches in presenting his estimates of the August 1, 1968 fair market value of the timber in issue. First, he valued the timber other than Ponderosa Pine. Using the residual or "net back to stump" method, Thomas relied on the Ellingson Companies' operating statements to calculate the ultimate value of manufactured plywood products and from this value deducted sales costs, logging and manufacturing costs, and a 10-percent profit and risk factor in arriving at a stumpage value of $41.88 per MBF for timber other than Ponderosa Pine. [4]
*258 With respect to Ponderosa Pine, Thomas utilized a method by which he computed the difference in the weighted average bid of all USFS sales ($40.72) and the average sales prices of the Ellingson companies' end products converted to take into account an overrun factor $163.27. From this latter figure he subtracted the USFS weighted average selling price on a log scale basis ($122.11). The amount by which the Ellingson Companies' realization exceeded the average USFS price was $41.16 per MBF of cut timber. This $41.16 per MBF product sales "advantage" to the Ellingson Companies was then added to the average bid price for USFS timber of $40.72 per MBF, resulting in a timber value of $81.88 per MBF for the Ponderosa Pine. In a similar approach, Thomas analyzed five USFS sales of Ponderosa Pine which occurred in July and August 1968, comparing the USFS averages to the Ellingson companies' specific sales realization and costs and updating both the USFS sales data and manufacturing costs. This approach is succinctly explained in petitioner's brief as follows: On page 5 [of Thomas' report] which treats with Ponderosa Pine, the first column, Modesty Springs sale, indicates that the *259 petitioners' [Ellingson companies'] sales realization from pine products was $163.23, and that the Forest Service average was $99.26. This results in a sales advantage to the petitioners of $63.97. Then the petitioners' total manufacturing costs of $97.92 are compared to the Forest Service cost allowance of $73.67, which results in a cost disadvantage to the petitioners of $24.25. This is understandable in view of the fact that Forest Service cost inclusions are based on 1966 costs, and Ellingson's are current. Then a further adjustment of $3.54 is made for the profit and risk ratio based upon the excess of the petitioners' costs over Forest Service averages. The net differential is $36.18 credit to Ellingson. Sales advantage
63.97
Less: Cost disadvantage
24.25
P & R. disadvantage
3.54
27.79
Net advantage
36.18
To this is added the price actually paid for the stumpage at the Forest Service sale - $25.00. The result is that based upon an update of the Forest Service appraisal system, the petitioners could have paid $61.18 for the Modesty Springs sale and operated at a profit of 10% on cost. The same approach was applied to the other four sales. *260 The resulting values per MBF were multiplied by the number of feet in each sale, and the total thus arrived at was divided by the footage of all five sales, giving a weighted average for Ponderosa Pine of $59.14 per MBF. We think Thomas' analysis misses the mark insofar as it seeks to ascertain what the Ellingson companies "could have paid" for the timber and "operated at a profit of 10% on cost." The effect of this emphasis on the Ellingson companies' operating statements is to attribute all profits in excess of ten percent on cost during this period of rapidly rising lumber and plywood prices [5] to the value of the standing timber. The same reasoning would support an argument that the Ellingson companies could have afforded to pay higher wages to their employees, higher salaries to their executives, higher commissions to their sales force, or higher interest rates to their bankers. Thomas' analysis does not explain why all profits in excess of ten percent on cost should be attributed to the standing timber rather than to some other factor. *261 Nor are we satisfied that the Ellingson companies are representative of the participants in the timber market in the Baker, Oregon, area. Thomas' computations may reflect the "value" of the timber to the Ellingson companies, assuming that all other factors from which their actual profits were derived are properly adjusted. But section 631(a) refers to the fair "market" value of the timber. It does not refer to a computed price which a particular operator can afford to pay for the timber and make an assumed rate of profit. Petitioners' other expert, Sherman Feiss, offered testimony as to the August 1, 1968, timber value, basing his opinion primarily on the two non-USFS sales of logs referred to in our Findings. These transactions, a sale by Crown-Zellerbach to Kinzua Corporation in November 1968 and a sale by Edward Hines Lumber Co. to Ellingson Timber Co. in February 1969 were in Feiss' opinion the best indicators of the fair market value of timber in the Baker, Oregon, area as of August 1, 1968. Feiss estimated the value of Ponderosa Pine at approximately $46.50 MBF and the other species of timber at $44.50 per MBF. We are not satisfied from the testimony, however, that *262 these two isolated sales are representative of the overall timber market in the Baker area on August 1, 1968. Moreover, those transactions occurred four to five months after the August 1, 1968, valuation date. As emphasized by petitioners in other contexts, the trend of timber and lumber prices during that intervening period was dramatically upward. In addition, the Crown-Zellerbach-Kinzua sale called for the delivery of the logs to a rollway at a price of $47 per MBF. Instead of simply subtracting from the $47 figure the cost incurred by Crown-Zellerbach in cutting and delivering the logs to the rollway, [6] to find the value of the standing timber, as did respondent's witness Burgess, Feiss takes additional steps which mix in the cost experience of the Ellingson companies. To the cost of the logs at the rollway, Feiss adds the additional cost ( $23) of hauling them to the Kinzua mill and then subtracts only the Ellingson companies' logging and hauling costs required to move the logs to their Unity mill ($23.50), arriving at an indicated value of $46.50 per MBF for the Ponderosa Pine stumpage. [7] Feiss' computation thus adds to the value of the standing timber Crown-Zellerbach's *263 cost of cutting that timber, hauling it to the rollway, and hauling it from the rollway to the Kinzua mill. Under Feiss' computation, the Crown-Zellerbach's $47 per MBF selling price to Kinzua of the logs delivered to the rollway is only 50 cents per MBF more than his computed value of $46.50 per MBF. This computation *264 is a distortion. In essence, Feiss treats the value of the Crown-Zellerbach logs delivered at the rollway as if those logs were stumpage instead of cut logs ready for manufacturing into lumber or plywood products. Respondent's expert, William Burgess, formulated his opinion as to the value of standing timber by analyzing 21 USFS timber sales occurring between February 19, 1968, and December 23, 1968. Burgess justified his reliance on these sales on the grounds that the USFS sales were generally located near the timber being valued; the sales covered similar species of timber; they were subject to similar contractual obligations; and they bracketed the crucial date. Burgess' computation using these 21 sales transactions shows a valuation of $26 per MBF for Ponderosa Pine. Burgess adjusted this figure to $30.73 per MBF for Ponderosa Pine cut by Timber and $30.68 per MBF for similar species cut by Lumber. These adjustments reflected differences in road construction costs, the cost of hauling logs from the forest to the mills, and qualitative variances in the timber itself. Burgess also arrives at much lower values for the other timber species than are claimed by petitioners. *265 Petitioners steadfastly maintain that the USFS sales of 21 tracts located in the general area of the subject timber during the period February 19, 1968, to December 23, 1968, on which respondent's witness, Burgess, relied, do not reflect the value of the Ellingson companies' timber. However, the timber bought and sold in those transactions was held under the same general conditions as the subject timber. The sheer volume of those sales dictates their consideration. Yet several factors in Burgess' analysis are troublesome. Lumber and other end product prices, as well as production costs, had risen rapidly in the two or three-year period prior to August 1, 1968, and a continuing rise was foreseeable. [8] The USFS minimum bid prices were based upon averages which reflected product sales data three months old and a formula which used manufacturing cost data more than two years old. While Burgess used an indexing procedure to update the selling price data, we are not satisfied that his computations fully reflect the market conditions on the crucial date. Since the USFS minimum bid prices were keyed to the past, they gave no effect to the upward price trends. Moreover, the USFS *266 sales were not negotiated. Nor were they the product of sealed bidding. They were oral auction sales. We are not satisfied that these sales reflect the full fair market value of the timber as of August 1, 1968. We have studied the voluminous data introduced in evidence, and we have carefully considered the advice given to the Court by the able experts on both sides. In arriving at our conclusions as to the timber values in issue, we have concluded that the USFS sales were so voluminous that they would substantially affect the fair market value of standing timber even though the prices in such transactions during this period permitted purchasers, including the Ellingson companies, to make substantial profits from cutting and processing the *267 timber. While we do not attempt to articulate a mathematical formula, on consideration of all the evidence we conclude that the August 1, 1968, fair market values of the timber cut by Ellingson Timber Co. and Ellingson Lumber Co. during the fiscal year ended July 31, 1969 are as follows: Ellingson Timber Co.
Ponderosa Pine
$ 42.00
Douglas Fir
35.00
Larch
35.00
White Fir
31.25
Spruce
32.95
Lodge Pole
25.00
Ellingson Lumber Co.
Ponderosa Pine
$ 42.00
Douglas Fir
36.50
Larch
35.00
White Fir
31.25
Spruce
31.95
Lodge Pole
25.00
To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. The following cases are consolidated herewith: R. P. Ellingson and M. T. N. Ellingson, dkt. No. 4785-75; Robert P. Ellingson, Jr. and Helen M. Ellingson, dkt. No. 4998-75; Sigmund H. Ellingson and Lois Ellingson, dkt. No. 5019-75; and Donald M. Ellingson and Thaoma L. Ellingson, dkt. No. 5186-75.↩
2. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.↩
1. A unit of timber measurement used to describe timber volumes is "thousand board feet of timber Scribner scale." This unit of measurement is identified by the letters "MBF."↩
*. Avg. Annual Index Price↩
3. SEC. 631. GAIN OR LOSS IN THE CASE OF TIMBER, COAL, OR DOMESTIC IRON ORE.
(a) Election to Consider Cutting as Sale or Exchange.-If the taxpayer so elects on his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than 6 months before the beginning of such year) shall be considered as a sale or exchange of such timber cut during such year. If such election has been made, gain or loss to the taxpayer shall be recognized in an amount equal to the difference between the fair market value of such timber, and the adjusted basis for depletion of such timber in the hands of the taxpayer. Such fair market value shall be the fair market value as of the first day of the taxable year in which such timber is cut, and shall thereafter be considered as the cost of such cut timber to the taxpayer for all purposes for which such cost is a necessary factor. If a taxpayer makes an election under this subsection, such election shall apply with respect to all timber which is owned by the taxpayer or which the taxpayer has a contract right to cut and shall be binding on the taxpayer for the taxable year for which the election is made and for all subsequent years, unless the Secretary, or his delegate, on showing of undue hardship, permits the taxpayer to revoke his election; such revocation, however, shall preclude any further elections under this subsection, except with the consent of the Secretary, or his delegate.For purposes of this subsection and subsection (b), the term "timber" includes evergreen trees which are more than 6 years old at the time severed from the roots and are sold for ornamental purposes.↩
4. Thomas' computations under this method with respect to species other than Ponderosa Pine may be summarized as follows: ↩
Net sales of plywood products
$ 173.52
Less: Logging and manufacturing costs
115.87
Conversion net cost
57.65
Margin for profit and risk (10%)
15.77
Indicated fair market value
$ 41.88
5. Petitioners' reply brief describes the rising prices during 1968 as follows: For the period covered by petitioners' fiscal year, the increase in selling prices was dramatic. 3rd quarter 1966
88.52
4th quarter 1966
85.36
1st quarter 1967
84.04
2nd quarter 1967
87.11
345.03
Average
86.26
3rd quarter 1968
103.20
4th quarter 1968
114.28
1st quarter 1969
139.07
2nd quarter 1969
148.63
505.18
Average
126.30
The increase was 40.04; 46.42%.↩
6. Respondent's witness, Burgess, computed the timber value as follows: Cost for MBF of logs at rollway
$ 47.00
Less cost of logging to rollway
-18.00
Less cost of administration to rollway
- 2.00
Less profit and risk factor
- 2.00
Indicated value
$ 25.00
Indeed, at one point Feiss testified on cross examination: Q. Now based solely upon the transaction between Crown Zellerbach and Kinzua to get the logs back to the stump if you will, we would subtract from the $47.01, the $23.00 logging costs, is that not correct? A. Yes. ↩
7. Feiss' computation may be summarized as follows: ↩
Cost of logs at rollway
$ 47.00
Plus cost of hauling logs to
Kinzua mill
23.00
Total cost of logs to Kinzua
$ 70.00
Less Ellingson's logging costs
and cost of hauling to Lumber's
mill at Unity
23.50
Indicated value
$ 46.50
8. Sigmund Ellingson testified: Q. As of the fall of 1968, you did not forsee any drastic change in market conditions, did you? A. In the fall of '68, we anticipated a market improvement definitely. Q. But nothing substantial. A. We anticipated it to be substantial. While this testimony was related specifically to the "fall of 1968," we infer that substantial price rises were also foreseeable on August 1, 1968.↩